Eric L. HANAGAN, by Linda W. HANAGAN, Natural Parent and Next Friend of Eric L. Hanagan, Petitioner,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 88–25V.

United States Claims Court.

Nov. 14, 1989.

David G. Martin, St. Paul, Minn., attorney of record, for petitioner.

Gemma Flamberg, Rockville, Md., Office of General Counsel, Dept. of Health and Human Services, attorney of record, for respondent.

OPINION [1]

HARKINS, Senior Judge.

Linda W. Hanagan, in a petition filed October 3, 1988, seeks compensation under the National Vaccine Injury Compensation Program (the Program) [2] for injuries to her son, Eric L. Hanagan, that resulted from administration of a diphtheria-tetanus-pertussis (DTP) vaccine on November 6, 1984. The vaccine was administered before October 1, 1988, the effective date of the Program, and provisions limiting compensation for retrospective cases are applicable.

Eric L. Hanagan was born September 7, 1984. There were no significant complications during the pregnancy and he was born a healthy baby. There is no evidence that Eric's health had been harmed by any event before the DTP vaccination. On November 6, 1984, Eric Hanagan received a DTP vaccine in Minneapolis, Minnesota. Less than 24 hours after receiving the vaccination, Eric on November 7, 1984, suffered a seizure. Two additional seizures

were experienced on November 7, 1984. The three seizures were afebrile seizures.[3]

After November 7, 1984, Eric's behavior changed significantly. He became shaky and would fall down vomiting, or he would turn grey and wheeze. He would frequently stare off absently, his eyes would wander. These episodes were brief and were not observed by physicians; they were observed, however, by day care providers, grandparents, and by his father.

In the evening of October 24, 1985, Eric became feverish, shaky, and he vomited. At the hospital emergency room he went into a tonic clonic grand mal seizure, jerking constantly. This seizure ended spontaneously. Twelve days later, on the morning of November 5, Eric experienced another seizure. The seizures on October 24, 1985, and November 5, 1985, were accompanied by fevers of at least 102° and the clinical diagnosis was febrile seizures.

Petitioner's seizure disorder has continued. Eric has almost daily episodes with epilepsy. This disorder is expected to continue, and it is questionable whether this seizure disorder ever can be controlled medically. The special master described Eric's seizures on the basis of information in the record as follows:

His seizures begin with distinct symptoms. Eric may become blind or paralyzed forcing him to stagger voicelessly through the house crashing into walls as he seeks help; he may drag himself down the hall to his mother. Frequently he is taken with an aura of fear and experiences hallucinations. The hallucinations may appear to him in the form of monsters. He will become incontinent, losing control of bowels and bladder. Often the seizures end in the hospital. After a seizure, exhausted, he will have

---

1. This opinion may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within 14 days of the date of filing this opinion, the parties shall designate any material subject to section 300aa–12 and such designated material will be deleted for public access. If on review of this opinion there are no objections filed within the 14 day period, then it shall be deemed that there is no material subject to section 300aa–12.

2. National Childhood Vaccine Injury Act of 1986, as amended, by the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, Title IV, Dec. 22, 1987, 42 U.S.C. §§ 300aa–1 et seq. (*See* U.S.C.A. 1989 Supp.).

3. An afebrile seizure for purposes of the Vaccine Program is a seizure unaccompanied by fever, or accompanied by a fever of less than 102° F. 42 U.S.C. § 300aa–14(b)(2).

lost control of his body and will need to be cleaned. He will be "palsied" and unable to feed himself the next day.

The seizure medicine also has its toll. Much of the medical testimony confirmed its harmful affect on Eric's intelligence. The medicine also causes Eric nosebleeds and impairs his attention. He becomes awkward; his speech is slurred; he suffers headaches. On the other hand, certain medicine makes him hypertensive and unable to sleep for days at a time.

*Prior Proceedings*

The petition, filed October 3, 1988, was supported by extensive medical records, opinion letters from the family physician and treating pediatric neurologist, and additional documentation. On November 14, 1988, petitioner served a first amended petition by mail on respondent. The first amended petition was received in the United States Claims Court on November 15, 1988. The amended petition lacked an affidavit of service and was not filed at that time.

An attorney from the Department of Justice filed a notice of appearance as attorney of record for the respondent on December 13, 1988. Respondent's answer was filed December 30, 1988. At the time the answer was filed, respondent had notice of the allegations in the amended petition and was in possession of the extensive documentation supplied by petitioner to support the claim.

The answer was a general denial of liability that was filed before respondent had completed its review of the medical records and other documentation supporting the petition. The answer asserted, without reference to specific facts, four defenses: (1) lack of jurisdiction over the subject matter; (2) failure to state a claim upon which relief may be granted; (3) failure to demonstrate by a preponderance of the evidence the matters required by the Act; and (4) that a preponderance of the evidence demonstrat-ed that the petitioner's injuries were due to factors unrelated to administration of the vaccine.

On February 1, 1989, pursuant to General Order No. 23, Vaccine Rule 16, the petition was assigned to the judge and to the special master. On February 7, 1989, by leave of the special master, the first amended petition for vaccine compensation was filed, and on February 15, 1989, the affidavit of service was filed with the Clerk of the court.[4]

By order on February 8, 1989, the special master established a schedule to complete discovery. By order on February 27, 1989, the special master directed that pursuant to Vaccine Rule 17(c) a settlement conference would be held on March 8, 1989. Counsel for each party participated in this conference. When the petitioner expressed concern over the respondent's general denial, respondent stated that the statutory restrictions compelled it to submit this answer. Respondent also stated that the first defense (lack of subject matter jurisdiction) had been withdrawn, and that the other defenses would be abandoned when more information became available.

The special master on March 13, 1989, directed respondent to make available to the petitioner by April 15, 1989, a copy of its expert's report, and, if respondent could not withdraw defenses concerning the issue of causation, established a trial schedule for the week of May 1, 1989. A telephone status conference was held on April 17, 1989. Counsel for each party participated in this conference. At that conference, respondent's counsel stated that the Department of Justice had filed a motion for a 90-day stay in the vaccine cases.

On April 20, 1989, the special master ordered all discovery to be completed by April 28, 1989; a prehearing conference was scheduled for May 10, 1989; and a hearing for May 16, 1989.

On May 9, 1989, respondent's counsel filed a notice of withdrawal as attorney of

---

4. The statute requires the court to render its judgment on a petition filed under the program as expeditiously as practicable but not later than 365 days after the date on which the petition was filed. 42 U.S.C. § 300aa–12(d)(3). Pursuant to General Order No. 20, this case is deemed to be filed as of November 15, 1988.

record for the reason that counsel had resigned from the Department of Justice, effective May 7, 1989. Respondent did not file an amended answer and did not withdraw its December 30, 1988, answer.

The litigation posture of the Department of Justice in the Vaccine Injury Compensation Program has followed an erratic course. The respondent is the Secretary of the Department of Health and Human Services. The Attorney General is designated by statute to represent respondent in this court.[5] On April 12, 1989, the chief judge was advised that the Department of Justice intended to seek an immediate suspension of 90 days of all litigation under the Vaccine Injury Compensation Program. Subsequently, motions to suspend proceedings in all vaccine cases were filed by the Department of Justice. The motions also advised the court of the department's intention to limit participation by counsel to "such action as is contemplated by 42 U.S.C. § 300aa–12(d)(1)."

In view of the extraordinary nature of the defendant's motion, the chief judge, prior to ruling, held a hearing on an expedited basis. The hearing was conducted on May 5, 1989. The chief judge, in an extended opinion and order, on May 16, 1989, denied the motion to suspend proceedings. With respect to the role of counsel for the respondent, the chief judge directed respondent to answer certain questions relative to any limited participation pursuant to section 300aa–12(d)(1).[6]

The Department's response, filed on May 26, 1989, stated that, given the current status of resources available to the Department of Justice and the Department of Health and Human Services, full participation as currently envisioned by the court in this case and the remaining cases filed under the Vaccine Injury Compensation Program is not possible. The Department also stated that new Department of Justice attorneys will not be designated in cases from which an attorney has withdrawn or in which no appearance has yet been filed, and that the Secretary of Health and Human Services will not be entering a separate appearance in cases under the Program.

The special master conducted a 2–day hearing in St. Paul, Minnesota on June 27–28, 1989. During the hearing, petitioner presented four witnesses who testified to the connection between the seizure disorder and the DTP vaccination. Respondent did not participate. No attempt was made to cross-examine any of petitioner's witnesses, no rebuttal witnesses were called, and respondent offered no evidence.

The special master, prior to the hearing, had issued an order for final briefs and argument concerning the intent and meaning of the limitations in 42. U.S.C. § 300aa–15(b). At the hearing, the deadline for filing was extended to July 12, 1989. Respondent did not file a brief or offer any supporting documentation.

The special master filed his report on August 25, 1989. The report recommends that the court find that the petitioner has proven eligibility for compensation, and that the court award compensation in the following amounts:

$2,153,376.00 — for future medical expenses under section 300aa–15(a)(1)(A)

---

5. 28 U.S.C. § 518 (1982).

6. The May 16, 1989, order sought answers to the following questions:

1. If a Department of Justice attorney is currently designated as attorney of record in this case, will this attorney participate fully in the case, before the special master as well as before the judge after a recommended decision is filed? If the answer is negative, will the current attorney of record be filing a formal notice of withdrawal as counsel of record?

2. If the answer to the first part of question 1. was negative, or if no Department of Justice attorney is currently designated as attorney of record, answer the following questions:

—Will the Department of Justice designate a new attorney in this case?

—Is the Department of Justice withdrawing as counsel for the Secretary of the Department of Health and Human Services (Secretary) in this case?

—If the Department of Justice withdraws as counsel, will the Secretary appear before the court pro se or be represented by counsel from the Department of Health and Human Services?

$ 588,451.00 — for loss of earnings under section 300aa–15(a)(3)

$ 150,000.00 — for actual and projected pain and suffering and emotional distress under section 300aa–15(a)(4)

$ 58,819.23 — for attorneys' fees and other costs of this litigation.

_____

$2,950,646.23   Total

On September 14, 1989, a Department of Justice attorney filed a notice of appearance as attorney of record for the respondent, and on that date filed a document captioned "Respondent's Objection to Report and Recommendation for Judgment." Petitioner timely filed a response on September 27, 1989. At a telephone conference on September 29, 1989, both petitioner and respondent were represented by their respective attorneys of record.

On October 4, 1989, an attorney in the Office of General Counsel of the Department of Health and Human Services filed a notice of appearance as attorney of record for respondent. On October 16, 1989, respondent filed a reply to petitioner's September 27, 1989, response. Concurrently, on October 16, 1989, petitioner filed a motion to strike respondent's September 14, 1989, objection.

*Respondent's Participation*

Respondent's September 14, 1989, objection to the special master's report and recommendation is concerned with three matters. 1. Respondent contends that petitioner has failed to establish eligibility for compensation by proving either a Table injury, or, by a preponderance of the evidence, an injury caused by the vaccine. 2. The special master allegedly erred in construing the limitation imposed by section 300aa–15(b) as to the total amount that may be awarded in retrospective cases for lost wages, pain and suffering and attorneys' fees. 3. The special master allegedly calculated erroneously the amount of compensation allowable for impaired wages under section 300aa–15(a)(3).

Respondent's argument relative to petitioner's eligibility for compensation under the standards of section 300aa–14(a) involves concepts that are particularly fact intensive. Respondent's arguments relative to the other objections go to the intent and content of section 300aa–15(b) and section 300aa–15(a)(3)(B), and primarily involve concepts that apply to statutory construction.

In the motion to strike, petitioner contends that respondent's failure to participate in the proceedings before the special master was contrary to the requirements of both the statute and the rules of this court, and for this reason respondent's objections should not be heard. Petitioner emphasizes respondent failed to meet deadlines established by the special master, and that petitioner complied with the court's rules notwithstanding respondent's failure to participate. Petitioner argues that it was obligated to adhere to strict deadlines and that respondent should not be allowed to submit arguments and support for its contentions for the first time on review. Petitioner further argues that respondent's failure to appear cannot be justified under any concept of excusable neglect.[7]

Respondent's failure to implement the statutory program, in part, is due to a lack of resources. Petitioner contends that it should not be penalized for respondent's administrative problems.

Petitioner during the hearing moved for sanctions and an award of attorneys' fees under Vaccine Rule 11.[8] The special mas-

---

**7.** Petitioner cites *McDermott v. Lehman*, 594 F.Supp. 1315 (D.C.Me.1984) (mere fact that an attorney is busy with other matters does not excuse neglect for purpose of relief from judgment); *American and Foreign Ins. Ass'n v. Commercial Ins. Co.*, 575 F.2d 980 (1st Cir.1978) (no excusable neglect where trial date known to parties and party failed to show up for trial); *Greco v. Reynolds*, 416 F.2d 965 (3rd Cir.1969) (no "excusable neglect" where despite repeated admonition of attorneys for prevailing party, defendants did not enter an appearance or file an answer); *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601 (7th Cir.1986) (attorney's involvement in another trial provided no excusable neglect where attorney failed to appear at scheduled pretrial conference).

**8.** Vaccine Rule 11 follows RUSCC 11 and FRCP 11. In pertinent part Vaccine Rule 11 provides:

Every pleading, motion, and other paper of a party represented by an attorney shall be

ter concluded that respondent's failure to participate did not entitle petitioner to sanctions under Vaccine Rule 11. The special master, however, noted:

> The court cannot tolerate the conduct of the respondent or his attorneys of the Department of Justice. As discussed above, the respondent is important to the careful development of the court's law in the early Vaccine Act cases. The respondent is implicitly charged with a variety of roles which were not performed in this case. Yet, the respondent appears to have defaulted.

> The record contains three unusual pleadings which were filed by the Department of Justice attorneys. The pleadings complain ambiguously about the court's proceedings and present a posture of non-participation presumably heedless of the client agency's responsibility under the statute. Because of these pleadings the court cannot clearly determine what the respondent agency's ministerial position would be were it represented, nor whether it might elect to be represented independently. The willful refusal of these attorneys, and perhaps of the Attorney General, to participate in this case in any capacity leaves a pall over the facts in the decision.

> This is reprehensible and irresponsible. By itself this refusal does not entitle the petitioner to sanction under Vaccine Rule 11. Yet it should at least lead to a

professional reprimand for the culpable individuals.

In its response to respondent's objections and in its motion to strike, petitioner has not pursued a request for sanctions for violation of the requirements of Vaccine Rule 11. The matter has not been briefed to the court. In view of the confusion that has arisen in the early stages of this novel and experimental Program to compensate vaccine injury claims, no determination is made as to respondent's compliance with the requirements of Vaccine Rule 11.

Participation by attorneys of record for respondent is an element integral to efficient administration of the Vaccine Injury Compensation Program. Failure of respondent to participate jeopardizes the objectives sought to be achieved in the Program and increases the burden on the special master and the court. In addition to these policy considerations, respondent's refusal to participate is contrary to specific requirements of statutes enacted by Congress and to the rules of this court.

Congress has authorized this court to appoint special masters to assist in carrying out its functions.[9] The court's authority to utilize special masters was a consideration that lead to the 1987 amendments to base jurisdiction for vaccine injury cases in the United States Claims Court in lieu of the district courts.[10] The amended Vaccine Injury Compensation Program augmented the role of the special master. The special master was directed to perform functions

---

signed by the attorney of record in the attorney's individual name, whose address and telephone number shall be stated ... The signature of an attorney or party constitutes a certification by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation ... If a pleading, motion, or other paper is signed in violation of this rule, the judge, upon recommendation of the special master, or upon the judge's own initiative, shall impose upon the person who signed it, a represented party,

or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of a pleading, motion, or other paper, including a reasonable attorney's fee.

9. 28 U.S.C. § 798(b) states:

> The chief judge of the Claims Court may appoint special masters to assist the court in carrying out its function. Any special masters so appointed shall carry out their responsibilities in accordance with the rules of the Court.

10. Conference Report to accompany H.R. 3545. H.R.Rep. No. 495, at 771–72, 100th Cong., 1st Sess., *reprinted in* 1987 U.S.Code Cong. & Ad. News, 2313–1, 2313–1245, 2313–1517 to 2313–1518.

consonant with the court's authority under 28 U.S.C. § 798(b). The special master "shall serve as an adjunct to the court and shall prepare and submit to the court proposed findings of fact and conclusions of law." [11]

The court's vaccine rules are specific as to the powers of the special master. The special master's function is at the core of the court's procedures in a vaccine injury claim. Rule 16 of the Vaccine Rules includes the following responsibilities given to special masters:

Case Management—The special master has initial responsibility, and may determine motions on the merits without oral argument upon written statements of reasons in support and opposition.

In addition the special master:

—may require the submission of such information, testimony of any person, and the production of any document as may be reasonable and necessary;

—may conduct such hearings as may be appropriate;

—may recommend the imposition of monetary sanctions;

—may initiate discovery and enter other orders requiring the making of discovery, and

—may enter orders compelling discovery and imposing sanctions other than monetary sanctions, dismissal of a petition, or an order holding a party in contempt.

Petitioner's motion to strike would penalize respondent for its failure to participate fully in this case. The sanction to strike respondent's objections is within the power of the court, and such action on the facts may be warranted. In exercise of a reviewing function, courts frequently decline to consider contentions of fact and argument that are advanced for the first time on appeal.[12] Respondent's failure to participate in the proceedings deprives the special master of the substantial benefits that could be available by reason of respondent's expertise. Similarly, respondent's failure to participate before the special master deprives the court of the special master's consideration and recommended disposition of the contentions respondent now makes.

Respondent's objections, however, discuss matters in which guidance is needed and, in the interest of justice in disposition of this claim, should be considered to the extent respondent's views might be helpful. To strike the objections in their entirety could deprive the court of legal analysis that provides beneficial guidance.

Respondent's objections with respect to petitioner's eligibility for compensation involves examination of factual evidence and arguments by petitioner's experts in the presentation of its proof that there has been compliance with statutory requirements. Respondent's failure to participate as to this body of factual evidence, on the question of eligibility for compensation, renders respondent's objections superficial, and any assistance to the court is questionable. For the foregoing reasons, respon-

---

**11.** Section 300aa–12(c)(2). The statute authorizes the special master to:

(A) require such evidence as may be appropriate for the preparation of proposed findings of fact and conclusions of law with respect to whether compensation is to be provided under the Program and the amount of any such compensation,

(B) require the submission of such information as may be reasonable and necessary to determine if the petitioner is entitled to compensation,

(C) require the testimony of any person and the production of any document as may be reasonable and necessary to determine if the petitioner is entitled to compensation, and

(D) conduct such hearings as may be appropriate.

**12.** *Constant v. Advanced Micro–Services, Inc.,* 848 F.2d 1560, 1566 (Fed.Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988) (where a party in a patent infringement action participated in hearings before the special master and subsequently challenged the special master's interpretation of the evidence, the court stated "[a] party cannot wait to see whether he likes a master's findings before challenging the use of a master. Failure to object in a timely manner constitutes a waiver."); *Weinar v. Rollform, Inc.,* 744 F.2d 797, 809 (Fed.Cir. 1984) (plaintiff's failure to object to the absence of interrogatories in a patent infringement action precludes the assignment of that absence as error on appeal).

dent's objections to petitioner's eligibility for compensation will not be considered.

This deficiency does not apply to matters 2 and 3 to which respondent objected. These matters essentially embody exercises in statutory construction. Respondent's objections as to the intent and meaning of sections 300aa–15(b) and 300aa–15(a)(3), accordingly, will be considered. Petitioner's motion to strike is allowed in part and denied in part.

*Eligibility*

■ Under the Program, compensation shall be awarded if the court finds on the record as a whole that: (a) the petitioner has demonstrated by a preponderance of the evidence the matters required by section 300aa–11(c)(1) to be in the petition, and (b) there is not a preponderance of the evidence that the injury or condition described in the petition is due to factors unrelated to the administration of the vaccine.[13]

Section 300aa–11(c)(1) describes the elements that must be contained in a petition for compensation in the Program. For the injury resulting from administration of DTP vaccine in this case, that section provides the petition shall contain an affidavit and supporting documentation demonstrating that the injured person:

—received a vaccine set forth in the Vaccine Injury Table;

—received the vaccine in the United States or in its trust territories;

—sustained, or had sufficiently aggravated, any injury or condition set forth in the Vaccine Injury Table in association with the vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such injury or condition occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, or

—sustained, or had significantly aggravated, any injury or condition set forth in the Vaccine Injury Table the first symptom or manifestation of the onset or significant aggravation of which did not occur within the time period set

forth in the Table but which was caused by the vaccine,

—suffered the residual effects or complications of such injury or condition for more than 6 months after the administration of the vaccine, and incurred unreimbursable expenses of more than $1000 therefrom,

—has not previously collected an award or settlement for damages for such vaccine related injury.

The Vaccine Injury Table is set forth in section 300aa–14(a). The Table identifies four categories of vaccines, lists covered injuries and conditions resulting from administration of the vaccines, and establishes the time period in which the first symptom or manifestation of onset or significant aggravation of such injuries or conditions is to occur after vaccine administration. The Vaccine Injury Table for DTP vaccine provides that the symptoms or manifestation of onset of a residual seizure disorder must occur within 3 days after vaccine administration.

Elements of a residual seizure disorder for a Table injury are set forth in section 300aa–14(b)(2)(B). These are:

A petitioner may be considered to have suffered a residual seizure disorder if the petitioner did not suffer a seizure or convulsion unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit before the first seizure or convulsion after the administration of the vaccine involved and if—

\* \* \* \* \* \*

in the case of [DTP], the first seizure or convulsion occurred within 3 days after administration of the vaccine and 2 or more seizures or convulsions occurred within 1 year after the administration of the vaccine which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit.

Petitioner has the burden of proof as to all elements of section 300aa–11(c)(1). In this case, petitioner presented evidence to establish a Table injury as required in section 300aa–11(c)(1)(C)(i), and to demonstrate

---

13. Section 300aa–13(a).

a vaccine caused injury under section 300aa–11(c)(1)(C)(ii)(II).

The special master found the evidence in the record as a whole sufficient to support a Table injury as well as to establish by a preponderance of the evidence that the vaccine caused the injury. It is clear that three seizures were experienced on November 7, 1984. That these three seizures were afebrile (not accompanied with a fever of 102° or higher) was confirmed by the testimony of three physicians.

The preponderance of evidence also supports the finding that petitioner proved the elements required by section 300aa–14(b)(2)(B). The special master found:

> The petitioner has also demonstrated causation under the Vaccine Act with a preponderance of the evidence. That is, she has shown that Eric sustained, or had significantly aggravated, an injury detailed in § 14, which was caused by a vaccine referred to in § 14. To do this she needed to show a causal connection between the injury and the vaccine, and she needed to exclude other possible intervening causes.
>
> She has accomplished this with persuasive and unrebutted expert testimony. The petitioner's expert witnesses collectively testified that the pertussis portion of the DPT vaccine Eric received, could have and did cause Eric's seizure disorder. They further explained that nothing else in Eric's life could have caused his injury. The DPT vaccine stands as the proximate cause of the injury this boy is suffering. There is no persuasive evidence to support contrary finding.

*Compensation*

The Program, for a petitioner found to be eligible, provides compensation for

14. Section 300aa–15(a)(1).

15. Section 300aa–15(a)(2).

16. Section 300aa–15(a)(3).

17. Section 300aa–15(a)(4).

18. Section 300aa–15(e).

(1) medical or remedial care, and a variety of custodial and rehabilitative services.[14]

(2) award of $250,000 in the event of death.[15]

(3) loss of earnings.[16]

(4) pain and suffering.[17] and

(5) reasonable attorney fees and other costs.[18]

With respect to retrospective cases, the 1986 Act limited compensation to the future costs of medical, custodial, remedial and rehabilitative care services incurred from the date of judgment. The 1987 amendments continue to exclude costs of such care incurred before the date of judgment, but expanded the coverage in retrospective cases to permit inclusion of compensation, subject to a $30,000 cap, for loss of earnings and for pain and suffering.[19]

Payment of compensation under the Program, pursuant to the 1987 amendments, "shall be made in a lump sum determined on the basis of the net present value of the elements of the compensation."[20] In retrospective cases, the compensation is to be paid in four equal annual installments.[21] The compensation for retrospective cases is paid from appropriations for the Department of Health and Human Services. Compensation for injuries resulting from vaccines administered after October 1, 1988, are made from the Vaccine Injury Compensation Trust Fund.[22]

■ Petitioner, as an eligible claimant, is entitled to compensation for the cost of future medical care services. These are actual unreimbursable expenses from the date of judgment, and reasonable projected unreimbursable expenses which, as defined in the statute:

(i) result from the vaccine-related injury for which the petitioner seeks compensation,

19. Section 300aa–15(b).

20. Section 300aa–15(f)(4)(A).

21. Section 300aa–15(f)(4)(B).

22. Section 300aa–15(i).

(ii) have been or will be incurred by or on behalf of the person who suffered such injury, and

(iii)(I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or

(II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotion or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expense, and facilities determined to be reasonably necessary.[23]

Petitioner also is eligible for anticipated loss of earnings, for pain and suffering and emotional distress, and for attorneys' fees and other costs, subject to the limitation applicable to retrospective cases.

In the initial and amended petitions, petitioner sought as compensation a reversionary medical trust, funded by four equal annual payments, for a total of $750,000. Compensation for loss of earnings, pain and suffering and attorneys' fees and costs was requested in a lump sum of $30,000.

Petitioner's claim for future custodial, medical, remedial and rehabilitative services was supported by reports and testimony from a health care consultant, an economist and an annuitist. The bulk of the costs for these future care services, as defined in the projected life plan for Eric Hanagan arose from his need to have 24–hour a day supervision. The economist and annuitist presented separate methods of determining the net present value for the cost of the care services set forth in the projected life plan.

"Net present value" is a concept that represents the economic value of a contractual promise to pay another larger value in the future. There is no fixed formula for the calculation of present value in litigation. It is within the court's discretion to select the appropriate method for calculating this amount.[24]

Calculation of a present value for future medical expenses depends upon a detailed evaluation of the injury. The formula must include the life care needs of the injured person, and their likely cost in the future. Evaluation of the injury's impact upon life expectancy is important.

Petitioner's economist expert witness based the calculation of the net present value of the cost of Eric Hanagan's future care requirements on an assumed average life expectancy of 71.8 years. The report provided a present value of future costs to age 18, and a present value of future costs from age 18 to 71.8 years. The initial report of the economist expert witness estimated the present value on June 27, 1989, of the cost of future care requirements for Eric Hanagan, based on actual average costs over the past 3 years, to be $667,626 to age 18, and $1,611,301 from age 18 to average life expectancy of 71.8 years. After the hearing, on the basis of additional information, the estimate of present value was increased to $707,181 to age 18, and to $1,704,236 for the age 18 to 71.8 period, a total of $2,411,417.

The annuitist viewed the projected life plan from the perspective of an insurance professional. An annuity is the right to receive fixed periodic payments in the future for a term of years or for life. The annuitist's report considered Eric's life expectancy as a market factor in an annuity value. Calculation of an annuity value adjusts for life expectancy by rating the insured's age. The market value of the annuity is a reflection of the present value of the future stream of payments.

The initial report of the petitioner's annuitist expert witness presented the cost of Eric Hanagan's future care requirements to age 18 at $595,354, as of June 29, 1989, based on a rated age of 18, and based on actual average past medical costs, and at

**23.** Section 300aa–15(a)(1)(A).

**24.** *See St. Louis Southwestern R.R. Co. v. Dickerson,* 470 U.S. 409, 411–12, 105 S.Ct. 1347, 1348– 49, 84 L.Ed.2d 303 (1985); *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 541, 103 S.Ct. 2541, 2553, 76 L.Ed.2d 768 (1983).

$839,363 for care requirements for the age 18 to 71.8 period.

After the hearing, on the basis of additional information, the annuitist calculated the cost for an annuity that provided benefits of $4,932 per month compounding 5 percent per year, and payable in four equal annual installments rather than in one lump sum. The amount of each equal annual payment, as calculated by the annuitist, is $538,344. The special master adopted the annuitist's calculations, and concluded that the total amount to be paid as the net present value of future care services is $2,153,376. This conclusion is supported in the record considered as a whole and is adopted by the court.

*Retrospective Cases*

■ Section 300aa–15(b) applies to compensation for claims where the vaccine was administered before October 1, 1988. As amended in 1987, this section provides:

> Compensation awarded under the Program to a petitioner under section 300aa–11 of this title for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subpart *may not* include the compensation described in paragraph (1)(B) of subsection (a) of this section and *may* include attorneys' fees and other costs included in a judgment under subsection (e) of this section, *except that the total amount that may be paid as compensation under paragraphs (3) and (4) of subsection (a) of this section and included as attorneys' fees and other costs under subsection (e) of this section may not exceed $30,000.* [Emphasis supplied.]

Facially, the language of section 300aa–15(b) seems to be straight forward and its meaning quite clear. Differing interpretations of the meaning of the amended provision, however, have created controversy. These differences were important in generating respondent's objections to the special master's report and recommendation.

The special master construed section 300aa–15(b) to mean that the $30,000 limitation applies only to attorneys' fees and other costs, and further, that the limitation applies only to those attorneys' fees and other costs which are attributable to proving claims under subparagraph (3) (loss of earnings) and subparagraph (4) (pain and suffering). The special master's interpretation permits compensation for attorneys' fees and other costs under section 300aa–15(e) that are not allocable to the claims for loss of earnings and for pain and suffering; attorneys' fees and costs not so-related are not subject to the limitation, and may exceed $30,000. Inasmuch as the $30,000 limitation would apply only to attorneys' fees and other costs, the special master's interpretation does not limit the amount of compensation that may be allowed for loss of earnings and for pain and suffering. The special master recommended compensation for loss of earnings in the amount of $588,451; compensation for pain and suffering and emotional distress in the amount of $150,000; and compensation for attorneys' fees and other costs in the amount of $58,819.23. The amounts recommended by the special master are not authorized by the statute.

Respondent contends that the construction of the special master is "a tortured interpretation of otherwise clear and unambiguous statutory language." In its objections to the special master's report, respondent argues that both the language and the legislative history of section 300aa–15(b) require, for retrospective cases, application of the $30,000 limitation to the total of all attorneys' fees and costs (including pre-Act litigation costs under section 300aa–15(e)(2)", lost wages, and pain and suffering.

Any ambiguity that may exist as to the meaning of section 300aa–15(b) is dispelled by the legislative history of the 1987 amendment. The House Report, in its section by section analysis of the reported bill, states:

> Subsection (e) provides for additional elements of compensation for retrospective cases. The Act allows retrospective cases to recover only for ongoing medical expenses and for attorney fees and costs. The amendments also authorize payment for lost earnings and pain and suffering, but limit the amount of payment that can

be made for all compensation except future medical expenses to a total of as much as $30,000, depending upon demonstrated need and particular circumstances. The court may allocate the compensation for these items as it finds appropriate in each individual case.[25]

In a letter dated October 15, 1987, the Congressional Budget Office (CBO) submitted to the chairman of the House Committee on Energy and Commerce its cost estimate for the vaccine compensation legislation. In this letter, the CBO, with respect to the meaning of the provision that became section 300aa–15(b), reported:

Under current law, limited compensation would be available to those who suffered certain vaccine-related injuries prior to the effective date of the program. For these retroactive cases, compensation would be made to cover death settlements and attorneys' fees and periodic payments would be made to cover future medical and rehabilitation expenses. This bill would allow these awardees to also receive compensation for lost income and a payment for pain and suffering. Although the types of compensation payable would be expanded under the bill, a limit of $30,000 would be imposed on the total of payments for income loss, attorneys' fees and pain and suffering.[26]

Respondent's construction of the meaning of section 300aa–15(b) is correct. In retrospective cases, compensation for a vaccine-related injury may include payment for future medical expenses, lost earnings, pain and suffering, attorneys' fees and costs, and if appropriate, a statutory death award of $250,000. Compensation for all attorneys' fees and costs, lost earnings and pain and suffering, however, may not exceed $30,000. The $30,000 cap does not reduce the $250,000 compensation in a statutory death award.

The controversy over interpretation of section 300aa–15(b) has been addressed by this court at length in other vaccine-related injury cases. Inasmuch as the disposition in this case of that issue conforms with the conclusions in those other cases, there is no need to develop further an analysis of the merit of respondent's objection.[27]

The amounts of compensation recommended by the special master, for each of the elements authorized to be compensated by section 300aa–15(b), substantially exceed the $30,000 limitation. Information in the record does not provide a basis for allocation of specific amounts for each of the elements. Accordingly, no portion of the $30,000 total compensation to be paid for attorneys' fees and other costs, loss of earnings, and pain and suffering, is allocated to any specific item.

Respondent objected to the special master's computation of compensation for impaired wages pursuant to section 300aa–15(a)(3). The objection involves an adjustment made by petitioner's economist to increase the award to replace after tax earnings on the investment of principal with tax-free income. Inasmuch as no allocation of the $30,000 limitation is made for lost earnings, this matter is moot on the facts of this case. No decision is made with respect to this objection.

*Conclusion*

On the basis of the report of the special master and review of the record established by the United States Claims Court, the court finds, as required by section 300aa–13(a), that the matters required to be shown in the petition have been demonstrated by a preponderance of the evidence, and that there is not a preponderance of the evidence that the vaccine-related injury described in the petition was due to factors unrelated to the administration of the vac-

25. H.R.Rep. No. 391(I), 100th Cong. 1st Sess., *reprinted in* 1987 U.S.Code Cong. & Ad.News 2313-1, 2313-371 to 2313-372.

26. H.R.Rep. No. 391(I), 100th Cong., 1st Sess., *reprinted in* 1987 U.S.Code Cong. & Ad.News 2313-367.

27. *Mikulich v. Secretary, Health and Human Services,* 18 Cl.Ct. 253 (1989); *see also Shaw v. Secretary, Health and Human Services,* 18 Cl.Ct. 646 (1989); *Matthews, Sr. v. Secretary of Health and Human Services,* 18 Cl.Ct. 514 (1989); *Bazan v. Secretary of Health and Human Services,* 18 Cl.Ct. 309 (1989).

cine. All requirements for an award of compensation under the Program have been fulfilled. For the reasons set forth in the opinion, petitioner is entitled to $2,153,-376 for future care services, and to $30,000 pursuant to the provisions of section 300aa–15(b). The total award is $2,183,376.

In the original and amended petitions, and throughout this proceeding, petitioner has recommended the amount awarded should be used to establish a reversionary medical care trust. For this purpose, a form for a proposed trust agreement was attached to the initial petition. Determination of the net present value of the elements of compensation has included consideration of this objective.

Establishment of a reversionary medical care trust, based on the $2,153,376 awarded for future medical expenses, is an appropriate safeguard for the interests of Eric L. Hanagan. Such safeguard is expected and recommended. The Director of the Program is referred, for such action as may be appropriate, to the trust agreement contained in Exhibit E to the petition filed October 3, 1988.

The Clerk is directed to enter judgment for petitioner in the amount of $2,183,376. This amount includes all attorneys' fees and other costs authorized under the Program. No additional costs are to be paid.