**Margie Marie DAVIS, Guardian for Mark Allan Davis, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 89–64V.

United States Claims Court.

Feb. 8, 1990.

Collie E. Norman, Denver, Colo., for petitioner.

Barbara Hudson, Rockville, Md., with whom Deputy Asst. Atty. Gen. Stephen C. Bransdorfer, appeared on behalf of respondent. John Lodge Euler, Deputy Director, of counsel.

### ORDER

FUTEY, Judge.

This child vaccine action is brought pursuant to the National Childhood Vaccine Injury Act of 1986 *as amended,* 42 U.S.C. § 300aa–10, *et seq.* (Supp.V.1987) (the Act), which establishes a program for payment of compensation for injuries or deaths resulting from the administration of vaccines.

The petition in this case was filed as of September 14, 1989, and this matter comes before the court on Special Master Paul T. Baird's Report and Recommendation for Judgment filed December 12, 1989.[1] He found that petitioner had established injuries resulting from a pertussis vaccine inoculation administered on August 31, 1951, and that petitioner met all other require-

---

1. The Report provided that within fourteen (14) days of its filing, the parties shall designate any material therein for deletion prior to public access. No designation was submitted. This Order contains no additional material. Accordingly, public access for this Order and Report shall now be afforded.

ments for relief under the Act. However, the Special Master noted that petitioner's medical and rehabilitative needs were met in full by the State of Colorado. At the hearing, no evidence was presented showing that the State would not continue to meet those needs for the remainder of petitioner's life. Therefore, no future medical and rehabilitative expenses were being sought by petitioner. After examining the remaining claims for compensation, the Special Master recommended an award of $598,379.00 for loss of income, $150,000.00 for pain and suffering and emotional distress, $2,539.50 for attorneys' fees and $379.52 for costs. The total recommended award was $751,298.02.

■ On January 2, 1990, respondent, after making no appearance at the hearing before the Special Master, filed with this court both an appearance and an objection to the Report and Recommendation for Judgment. Respondent argues that the Special Master erred in recommending an award in excess of the $30,000.00 limitation mandated by § 300aa–15(b) for lost wages, pain and suffering and attorneys' fees. In response, petitioner filed on January 17, 1990, a motion for leave to respond, which was granted. Then, on January 31, 1990, a response was filed which urged this court to adopt the Special Master's Report and Recommendation for Judgment in its entirety.

This court agrees with respondent's statutory construction of § 300aa–15(b) and limits the award from $751,298.02, to the maximum amount of $30,000.00. Analysis of pertinent law concludes that § 300aa–15(b) places a $30,000.00 ceiling to the total of three elements of compensation under the Act, namely: (1) lost wages, (2) pain and suffering, and (3) all attorneys' fees and other costs associated with the petition. *Hanagan v. Secretary of DHHS,* 19 Cl.Ct. 7 (1989); *Mikulich v. Secretary of DHHS,* 18 Cl.Ct. 253 (1989); *See also Shaw v. Secretary of DHHS,* 18 Cl.Ct. 646 (1989); *Matthews v. Secretary of DHHS,* 18 Cl.Ct. 514 (1989); *Bazan v. Secretary of DHHS,* 18 Cl.Ct. 309 (1989). This court adopts this line of reasoning here.[2] Accordingly, it is ordered that the Special Master's entire recommendation be reduced to $30,000.00, which is the maximum amount possible for petitioner's claims under § 300aa–15(b). In addition, no portion of the $30,000.00 compensation for loss of earnings, pain and suffering, attorneys' fees and other costs, is specifically allocated to a particular element.

### CONCLUSION

■ After reviewing the Special Master's Report and Recommendation, the parties' submissions, and relevant case and statutory authority, and pursuant to 42 U.S.C. § 300aa–12(d)(1), the court hereby adopts the Special Master's Report and Recommendation, including the findings and conclusions of law, as the Opinion of the court, with the exceptions set out above.[3] Consequently, the petitioner is entitled to an award of $30,000.00, pursuant to § 300aa–15(b). The full report is attached hereto.

The Clerk is directed to enter judgment for the petitioner in the sum of $30,000.00. No additional costs are to be awarded.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION FOR ENTRY OF JUDGMENT BY DEFAULT *

Filed Dec. 12, 1989.

PAUL T. BAIRD, Special Master.

---

**2.** *Contra Brown v. Secretary of DHHS,* 18 Cl.Ct. 834 (1989). Petitioner asks this court to follow the *Brown* decision. We decline to do so.

**3.** The court also declines to adopt that portion of the report which recommends a finding that respondent is in default pursuant to Vaccine Rule 55 and thus unable to participate before the court.

\* This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C.A. § 300aa–12 (West Supp.1989). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of the report there are no objections filed within the fourteen (14) day period, then it

## BACKGROUND

Petitioner seeks compensation under the National Vaccine Injury Compensation Program, 42 U.S.C.A. §§ 300aa–10 through 300aa–34 (West Supp.1989) (hereinafter referred to as §§ 10 through 34 of the Act[1]) for injuries sustained by her son, Mark Allan Davis (Mark), allegedly resulting from a pertussis vaccine inoculation on August 31, 1951. Respondent has failed to appear and respond to the petition.

On September 14, 1989, petitioner filed an application for recommendation of entry of default (hereinafter Application) pursuant to Vaccine Rule 55(a), which provides in pertinent part:

*Rule 55. Default.*

(a) *By the Judge.* In all cases, the party entitled to a judgment by default shall, prior to the submittal of the report by the special master, apply for a recommendation to the judge therefor, ... If, in order to enable the special master to enter a recommendation as to judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the special master may conduct such hearings or order such references as is deemed necessary and proper.

Rule 55(c) provides further that "[n]o judgment by default shall be entered against the respondent unless the petitioner establishes a claim or right to relief by evidence satisfactory to the judge."

The Application is based upon the petition and the exhibits attached thereto. Subsequent to filing the Application, petitioner filed a second personal affidavit (hereinafter Supp.Affidavit) (filed 11/3/89). On December 6, 1989, petitioner supplemented Mark's medical records by filing what purport to be complete records of Children's Hospital for 1951 (hereinafter Hosp.Rec.).[2] Having reviewed the record, the undersigned is of the opinion that it is unnecessary to conduct a hearing in this matter and that judgment by default should be entered in favor of petitioner and against respondent.

## FACTUAL BACKGROUND

Mark was born to petitioner at St. Lukes Hospital, Denver, Colorado, on June 17, 1951. Petition Exhibit (Ex.) A. On August 30, 1951, he was given his second pertussis immunization by William S. Davis, M.D., who is now deceased. Exs. A, D. Prior to August 31, 1951, Mark was developing as a normal child. Ex. A. The day after receiving the vaccine, he became sick: he had a fever and was extremely irritable. On the following day, he started twitching and began having convulsions. Hosp.Rec. at 31. He was hospitalized at Children's Hospital, Denver from September 4, 1951, through September 13, 1951. The history given on admission indicates that Mark was "well until 9–3 except for sudden starts about 3 days previous. He developed generalized convulsion starting [with] eyes rolling back and progressing over body. There was twitching of face and right-side extremities and rigidity of left side. Has had no fever nor suggested infection." Hosp.Rec. at 34. Due to continuing problems with convulsions, he was rehospitalized on September 18, 1951. After that time, Mark did not develop normally and continued to have seizures and convulsions. Ex. A.

In 1954, Mark was placed in the Colorado State Home and Training School (now called Wheat Ridge Regional Center). He has resided there ever since. *Id.;* Ex. G.

## PRESENT CONDITION AND PROGNOSIS

Mark is profoundly retarded. His latest habilitation plan indicates that expressively he communicates at the two-to-three month

---

shall be deemed that there is no material subject to § 300aa–12.

1. The National Vaccine Injury Compensation Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, as amended, 42 U.S.C.A. § 300aa–1 *et seq.*

2. The pages of these records were not bound or numbered when filed. The page references used in this report were assigned by the undersigned to the copy reviewed by him. That copy will be filed with this report to facilitate review by the court.

level and that receptively he communicates at the three-to-six month level. Ex. G. at 1. His health is stable, both physically and emotionally. *Id.* His overall adaptive functioning is at an age equivalent of 13 months. *Id.* at 6. His seizures are controlled through medication. *Id.* at 8. His long range prognosis is to stay much as he is. *Id.* at 10.

## PROOF REQUIRED TO OBTAIN COMPENSATION

Section 13(a)(1) of the Act states that compensation shall be awarded under the Program to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

In turn, under § 11(c)(1), a petitioner can establish entitlement to an award by demonstrating that the vaccine recipient in question—

(A) received a vaccine set forth in the Vaccine Injury Table ...,

. . . .

(B) received the vaccine in the United States or in its trust territories,

. . . .

(C) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) ..., and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition ... occurred within the time period after vaccine administration set forth in the Vaccine Injury Table,

. . . .

(D)(i) suffered the residual effects or complications of such illness, disability,

injury, or condition for more than 6 months after the administration of the vaccine and incurred unreimbursable expenses due in whole or in part to such illness, disability, injury, or condition in an amount greater than $1,000, ... and

(E) has not previously collected an award or settlement of a civil action for damages for such vaccine-related injury or death.

Finally, the Vaccine Injury Table itself, § 14(a) of the Act, lists (in Part I.) the pertussis vaccine as one of the covered vaccines, and also lists encephalopathy and residual seizure disorder as recognized "injuries, disabilities, illnesses, or conditions" (hereinafter condition) for the pertussis vaccine, if the first symptoms of the condition occur within three days after a vaccination. To establish the existence of a residual seizure disorder, it must be shown that a petitioner did not suffer an afebrile [3] seizure or convulsion before the first seizure after the administration of the vaccine, had a seizure or convulsion within three days after the administration of the vaccine, and had two or more afebrile seizures or convulsions within one year thereafter. § 14(b)(2).

If the above statutory requirements are satisfied, a petitioner need not prove actual causation and is entitled to an award of compensation unless there is a preponderance of evidence that the condition was due to factors unrelated to the administration of the vaccine.

## EVIDENCE AS TO CAUSATION

Robert H. Weaver, M.D., who practiced with Dr. Davis, stated that it was Dr. Davis' opinion that the pertussis immunization was the cause of Mark's problems. Ex. D. Records of Children's Hospital show a final diagnosis of "acute Encephalopathy due to pertussis immunication." Ex. C; Hosp.Rec. at 18, 32. There is no indication in the records of any alternative cause, although alternative causes were considered. Hosp.Rec. at 37. *See* § 13(a)(1)(B) of the Act.

---

**3.** That is, unaccompanied by fever or accompa- nied by a fever of less than 102° Fahrenheit.

## ANALYSIS OF THE EVIDENCE IN THIS CASE

The following findings of fact are supported by the record.

1. On August 31, 1951, Mark Allan Davis was administered the pertussis vaccine in Denver, Colorado.

Although no medical records establishing this finding are extant, their absence is understandable considering the time lapse, and the affidavit of Dr. Weaver and petitioner are sufficient to establish the fact of immunication. Moreover, the subsequent hospital records refer back to it. This satisfies the requirements of § 11(c)(1)(A) and (B) of the Act.

2. Prior to the administration of the vaccine, Mark experienced no seizures or convulsions and there was no indication of encephalopathy. Supp.Affidavit.

This finding is a required prerequisite to finding No. 4 *See* § 14(b)(2) of the Act.

3. Mark Allan Davis sustained an injury, disability, illness or condition set forth in the Vaccine Injury Table—namely, encephalopathy—in association with the pertussis vaccine, the first symptoms of which appeared within three days after the administration of the vaccine.

This finding is supported by the subsequent diagnosis of encephalopathy and the symptoms which were observed by petitioner within three days following the administration of the vaccine. This satisfies the requirement of § 11(c)(1)(C) of the Act.

4. Mark Allan Davis also sustained another injury, disability, illness or condition set forth in the Vaccine Injury Table—namely, residual seizure disorder—in association with the pertussis vaccine, the first symptoms of which appeared within three days after the first administration of the vaccine. He experienced many afebrile seizures during the first year after the administration of the vaccine.

The evidence indicates that the first convulsion occurred about 48 hours following the administration of the vaccine. This finding also satisfies the requirement of § 11(c)(1)(C) of the Act.

5. Mark Allan Davis suffered the residual effects of such injuries for more than six months after the administration of the vaccine and continues to suffer such residual effects.

This finding, together with finding No. 6, satisfies the requirement of § 11(c)(1)(D)(i) of the Act.

6. Petitioner has incurred unreimbursable expenses due to such injuries in an amount greater than $1,000. Ex. A.

7. Petitioner has not previously collected an award or settlement of a civil action for damages for Mark's injuries, no such action having been filed. *Id.;* Supp.Affidavit.

This satisfies the requirement of § 11(c)(1)(E) of the Act and shows that the jurisdictional requirement of § 11(a)(5)(B) of the Act has been met.

8. Mark's injuries were not due to factors unrelated to the administration of the pertussis vaccine.

This satisfies the requirement of § 13(a)(1)(B) of the Act that compensation may only be awarded if there is not a preponderance of evidence that the condition described in the petition was due to factors unrelated to the vaccine.

9. As a result of his vaccine-related injury, Mark will not be employable and will have a lifelong need for medical care and treatment.

10. As a result of his vaccine-related injury, Mark has experienced and will continue to experience pain and suffering.

11. Petitioner is Mark's duly appointed guardian. Ex. B.

This finding establishes petitioner's standing to file the petition pursuant to § 11(b)(1)(A) of the Act.

12. The pertussis vaccine administered to Mark on August 31, 1951, actually caused his condition.

This finding is not required where, as here, the first symptoms of a condition occurred within the time requirements of the Vaccine Injury Table, but it is supported by the contemporaneous diagnosis of encephalopathy due to pertussis immunization.

Taken together, these findings establish petitioner's right to an award of compensation under the Program.

## ELEMENTS OF COMPENSATION

The Act provides for three general elements of compensation to an injured petitioner in cases in which a vaccine was administered prior to October 1, 1988, the effective date of the Act: post-judgment medical and rehabilitative expenses, § 15(a)(1)(A); loss of earnings, § 15(a)(3); and pain and suffering and emotional distress, § 15(a)(4). Each of these elements will be considered in turn.

a. Future medical and rehabilitative expenses

No recovery of future medical expenses was sought and no award therefor is warranted. Mark's needs are being met in full by the State of Colorado and there is no evidence that the State will not continue to meet his medical and rehabilitative needs for the remainder of his life.

b. Loss of earnings

Section 15(a)(3)(B) provides that in cases such as this loss of earnings shall be "determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy, as determined by the Secretary." Since the respondent is not participating in this case, such determinations must be made by the court. The average gross weekly earnings in the private, non-farm sector in 1988 were $322.36[4] which amounts to $16,763 per year. Federal taxes may be calculated by deducting the standard deduction ($3,000) and personal exemption ($2,000) from annual earnings and multiplying the remainder by 15%.[5] This calculation produces a Federal tax of $1,764. The state income tax rate in Colorado is 5%, which will produce a state income tax of $588.[6] This leaves an after tax income of $14,411.

As to health insurance, it may reasonably be assumed that if Mark were employed, he would be covered by an employer-sponsored health insurance plan.[7] Since the employer-paid portion of the premium was not included in determining income, only the employee-paid portion of the premium should be considered in determining the average cost of a health insurance policy.[8] In 1985, the average one-person consumer unit spent $229 on health insurance.[9] Allowing for a 5% annual increase, the estimated expenditure in 1988 would have been $265. The court adopts that figure as the average cost of a health insurance policy. Deducting $265 from after tax income leaves net income of $14,146.

Worklife estimates are published by the Bureau of Labor Statistics.[10] The Act provides for compensation for loss of earnings from age 18. At age 18, the average worklife expectancy of a white male is 39.4 years.[11] That is a reasonable projection of what could have been expected had Mark not been injured by the pertussis vaccine. Multiplying Mark's yearly net income by his worklife expectancy produces a net loss of income of $557,352.

c. Pain and suffering and emotional distress

Section 15(a)(4) of the Act provides for an award of compensation for "actual and

---

4. *Employment and Earnings*, U.S. Department of Labor, Bureau of Labor Statistics, Vol. 36 No. 7 (July 1989), Table C.1 at 115.

5. Internal Revenue Code, 26 U.S.C. §§ 63(c)(2)(C) and 151(d)(1)(C) (Supp. V 1987).

6. Colo.Rev.Stat. § 39-22-104 (1988 Supp.).

7. Of the 180.1 million individuals with private health insurance coverage in 1985, 147.1 million (81.7%) had insurance related to their employment. *Statistical Abstract of the United States—1988*, U.S. Department of Commerce, Bureau of the Census, Table No. 140 at 92.

8. Fringe benefits were not included in the income calculation because their inclusion does not appear to be contemplated by the Act.

9. *Statistical Abstract of the United States—1988*, *supra* note 6, Table No. 139 at 91.

10. *Worklife Estimates: Effects of Race and Education*, Bulletin 2254, U.S. Department of Labor, Bureau of Labor Statistics, February 1986.

11. *Id.* at 13.

projected pain and suffering and emotional distress" not to exceed $250,000. It is clear that Mark has experienced pain and suffering and that he will do so for the remainder of his life. While it is recognized that no dollar amount will replace what Mark has lost in terms of his potential to experience life fully, an award of $150,000 pursuant to § 15(a)(4) for his pain and suffering is reasonable and appropriate.

## ADJUSTMENTS TO COMPENSATION AWARD

### a. Program not primarily liable

Section 15(g) provides that the Program is not primarily liable and that payment "under the Program shall not be made for any item or service to the extent that payment has been made, or can reasonably be expected to be made" under any State or Federal compensation or health benefits program, insurance policy, or prepaid medical plan. Since no medical expenses are being sought here, no adjustment is required.

### b. Reduction to net present value

Section 15(f)(4) requires that payment of compensation be based on the net present value of the elements of compensation. Net present value is determined by discounting future benefits by a figure which represents the real rate of return [12] which petitioner may be expected to receive from investment of the award. Petitioner did not offer any evidence as to an appropriate discount rate. The most conservative approach to investing the award may be to invest in instruments with widely varying maturities to level out the impact of fluctuations in interest rates. Using intermediate term instruments as a standard for determining a projected rate of return is consistent with that approach. Between 1967 and 1987, three-year Treasury securities had an average rate of return of 8.37%. Over the same period, ten-year Treasury securities had an average rate of return of 8.61%.[13] The average increase in consumer prices during that period was 6.2%.[14] Based on these figures, the court concludes that a 2.25% discount rate accurately reflects real rates of return over substantial periods of time and is an appropriate rate to use in this case.

### c. Tax impact

If the award for loss of earnings is invested to yield the projected rate of return, any income earned on the investment of the award for loss of earnings will be taxable. Since taxes were deducted in determining earnings lost, it is only fair that the award should be adjusted to offset taxes which will be paid on such income. *Shaw v. Secretary of the Department of Health and Human Services*, 18 Cl.Ct. 646 (1989). Assuming a federal tax rate of 15%, a state income tax rate of 5%, and standard deductions and exemptions, the award should be increased by about 18.5% to offset taxes.[15]

Taking the above-mentioned adjustments into account, an appropriate award for loss of earnings is $598,379.[16]

## ATTORNEYS' FEES AND COSTS

Under § 15(e) of the Act, a judgment which awards compensation *"shall* include an amount to cover—(A) reasonable attorneys' fees, and (B) other costs incurred in any proceedings on [the] petition." (Emphasis added.) Petitioner has filed an Affidavit and Interim Billing printout (hereinafter Fee Request) pursuant to § 15(e).

---

**12.** The real rate of return is nominal return less inflation.

**13.** Economic Report of the President—1989, 101st Cong., 1st Sess., House Doc. No. 101–2, Table B–71 at 390.

**14.** *Id.,* Table B–61 at 377.

**15.** If a tax-free investment vehicle were selected, no adjustment would be necessary, but at the assumed tax rate the difference in return would more than offset the adjustment, resulting in greater cost to the Program.

**16.** The calculations are set out in Appendix A hereto. Past earnings were included at the 1988 wage rate on the assumption that the 1988 figure reflects the current value of past earnings had they been invested when earned.

### a. Attorneys' fees

There are numerous federal statutes authorizing the award of attorneys' fees, generally to a prevailing party. *See* 11 Attorney Fee Reporter (P–H) No. 2 at 2 (Apr. 1988). Most of these statutes provide for the reimbursement of "reasonable attorneys' fees" with little, if any, guidance as to what is "reasonable." In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court set forth standards which it said were "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Id.* at 433 n. 7, 103 S.Ct. at 1939 n. 7. The Court said that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Id.* at 424, 103 S.Ct. at 1934.[17] The Court stated that the lodestar is subject to adjustment upward or downward based on other considerations. *Id.* at 434, 103 S.Ct. at 1939. Recently, in *Blanchard v. Bergeron,* —— U.S. ——, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), the Supreme Court reaffirmed the standards set forth in *Hensley.*

The lodestar approach to determining reasonable attorneys' fee awards has been applied by this court and other courts in cases in which the United States was a defendant. *Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516, 1517 (D.C.Cir.1988) (en banc); *Martin v. United States,* 12 Cl.Ct. 223, 227 (1987); *Cloverport Sand & Gravel Co. Inc. v. United States,* 10 Cl.Ct. 121 (1986); and *Crumbaker v. Merit System Protection Board,* 781 F.2d 191 (Fed.Cir.1986). Recently, it has been widely approved by the members of this court as an appropriate basis for determining fee awards in Vaccine Act cases.

 The burden is on the fee applicant to prove that the fee requested is reason-

able. To meet said burden, the applicant must submit evidence supporting the number of hours expended and the hourly rates claimed. As Judge Harkins wrote in *Martin:*

> A party submitting an application for an award of attorney fees should present evidence that supports hours worked at the rates claimed. Where supporting documentation is inadequate, the award may be reduced accordingly. A party who seeks payment must keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for the service, and the reasonable fee to be allowed.

12 Cl.Ct. at 227. To demonstrate "reasonable hours" worked, the applicant should provide contemporaneous time records and a personal affidavit in support of the fee petition. The applicant need not account for every minute expended. However, "at least counsel should identify the general subject matter of his time expenditures." *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12.

The Supreme Court in *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 recognized that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult." In discussing the applicant's burden, the Court stated that:

> To inform and assist the court in the exercise of its discretion [to award fees], the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

The petitioner's fee request has been reviewed in the context of the above-stated guidelines. Petitioner seeks compensation for 22.65 hours of attorney time at an hourly rate of $120. The hourly rate re-

---

**17.** The calculation of hours reasonably expended times a reasonable hourly rate is often referred to as the "lodestar." *See* E. Richard Larson, *Federal Court Awards of Attorney's Fees* (1981) 122–124.

quested is the amount petitioner agreed to pay for counsel's service in connection with this proceeding. It is supported by an affidavit of Brian J. Lampert, an attorney who has been licensed to practice in Colorado for ten years and who claims familiarity with the prevailing rates in the area. Mr. Lampert states that "$120 per hour for legal services is within the customary and prevailing range of rates for similar activities in cases of this nature." The rate is near the low end of rates requested in cases handled by the undersigned and appears reasonable for an attorney practicing in Denver. As to the time spent on the case, the 22.65 hours claimed are the lowest number claimed in any case handled by the undersigned. The individual time entries appear reasonable. It is recommended, therefore, that the Fee Request of $2,539.50 be allowed in full.

### b. Costs

The total amount claimed for costs is $379.52. All of the items and amounts claimed appear reasonable. The costs should be allowed in full.

### STATUTORY PROVISIONS RELATING TO PRE–ACT CASES

As noted earlier, § 15(e) of the Act sets out the general rule regarding the award of attorneys' fees and costs. Section 15(b), which was amended in 1987, provides as follows:

(b) Vaccines administered before the effective date. Compensation awarded under the Program to a petitioner under Section 300aa–11 of this title for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subpart may not include the compensation described in paragraph (1)(b) of subsection (a) of this section and may include attorneys' fees and other costs included in a judgment under subsection (e) of this section, except that the total amount that may be paid as compensation under paragraphs (3) and (4) of subsection (a) of this section and included as attorneys' fees

and other costs under subsection (e) of this section may not exceed $30,000.

There is, at the present time, a split of authority on the court as to the effect of this provision. Several judges have held that it places a cap of $30,000 on the aggregate of the awards for 1) loss of earnings, 2) pain and suffering, 3) attorneys' fees, and 4) costs. *See, e.g., Mikulich v. Secretary,* 18 Cl.Ct. 253 (1989) (Andewelt, J.); *Shaw v. Secretary, supra* (Rader, J.); and *Shepherd v. Secretary,* 18 Cl.Ct. 774 (1989) (Wiese, J.). Another member of the court adopted the type of analysis set out hereinbelow and did not construe the cap so broadly. *See Brown v. Secretary,* 18 Cl.Ct. 834 (1989) (Gibson, J.).

In order to determine the meaning and effect of § 15(b), it is necessary to review how it came to be. As originally enacted, § 15(a) set out the general rule on compensation, providing for recovery of: (a) post judgment medical and rehabilitation expenses, § 15(a)(1)(A); prejudgment medical and rehabilitation expenses, § 15(a)(1)(B); a $250,000 death award, § 15(a)(2); lost earnings, § 15(a)(3); and projected pain and suffering and emotional distress, § 15(a)(4). Section 15(b) limited the compensation which could be awarded in cases in which the vaccine was administered before the effective date of the Act (pre-Act cases):

(b) Vaccines administered before the effective date.

Compensation awarded under the Program to a petitioner under Section 2111 for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subtitle shall only include the compensation described in paragraphs (1)(A) [post judgment unreimbursable expenses] and (2) [$250,000 death benefit] of subsection (a).

Although compensation which could be awarded to injured pre-Act vaccine recipients was severely limited by § 15(b), subsection 15(e) made it clear that reasonable attorneys' fees could be awarded in all cases without any dollar limit. In reviewing an earlier version of what became of the Act, the House Energy and Commerce

Committee addressed the attorney fee issue quantitatively: "Because of the straightforward nature of the petition and the proceedings, the Committee does not anticipate that reasonable attorneys' fees will be large." H.R.Rep. 908, 99th Cong., 2d Sess. Pt. 1 at 22, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6363. Later in that same report, it was noted: "CBO ... estimates that the legal costs and attorneys' fees will be $50,000 per case in the compensation system. The Committee has assumed that costs under a no-fault, non-adversarial system will be significantly lower.... [L]egal costs may be as much as $15,000 per case in the compensation Program." *Id.* at 36 & 37, 1986 U.S. Code Cong. & Admin.News 6377 & 6378.[18]

The original Act did not contain a funding mechanism for paying compensation. It provided that the compensation program would not take effect until there was a tax enacted to provide funds for compensation payments. Pub.L. 99–660 Section 323(a), 100 Stat. 3784. The 1987 amendments established separate funding mechanisms for pre-Act and post-Act cases. Pre–Act compensation was to be paid from congressional appropriations. Post–Act compensation was to be paid from a trust to be funded by a tax on vaccines. Pub.L. 100–203 Section 4303(a), 101 Stat. 1330–221; 42 U.S.C.A. § 300aa–15. Considering the separate funding sources for pre-Act and post-Act cases, the requirement in § 11(a)(2) that post-Act cases be filed under the Program, and the impact of § 21 on the proof required in civil actions filed in post-Act cases, the establishment of differing compensation systems for pre-Act and post-Act cases is not surprising. What is unexpected is that an amendment to the Act which ostensibly expands the scope of compensation allowable in pre-Act cases should be construed (1) to take away potentially more than what it gives by capping attorneys' fees and costs at $30,000, and (2) to nearly invariably—at least in injury cases—place clients and attorneys in a direct financial conflict with one another by

including awards for lost income and pain and suffering within the $30,000 cap. Is this what the amendment to § 15(b) actually does?

A careful analysis of the language of the section leads the undersigned to conclude that it does not. Breaking the section (which consists of one sentence of more than 100 words) down into clauses, the first clause reads as follows:

> Compensation awarded under the Program to a petitioner under section 300aa–11 of this title for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subpart may not include the compensation described in paragraph (1)(B) of subsection (a) of this section....

The practical effect of the change of the verb from "shall only include" in the original version to "may not include" in the amended version is to expand the scope of potential compensation in pre-Act injury cases from the post judgment medical and rehabilitation expenses allowed under the original language to every element of compensation provided under § 15(a) and not expressly excluded by § 15(b). Thus, compensation under the amended language of the first clause may include lost income and pain and suffering as well as post judgment medical expenses, even though no affirmative right to compensation appears in the language itself; it may not include prejudgment medical expenses.

The second clause of the section deals with attorneys' fees and costs. Read in context, it provides: "Compensation awarded under the Program ... may include attorneys' fees and other costs included in a judgment under subsection (e) of this section,...." This clause makes it clear that attorneys' fees and costs are included within the scope of the term "compensation."

Next are the words "except that," which relate back to the preceding clause dealing

---

18. It appears that the Committee limited its consideration to fees and costs projected to be incurred in proceedings under the Program, ignoring for purposes of its analysis fees and costs incurred in any prior civil action.

with attorneys' fees and costs.[19] These words mean that there is an exception relating to the award of attorneys' fees and costs in pre-Act cases. What is the exception? "[T]he total amount that may be paid as compensation under paragraphs (3) and (4) of subsection (a) of this section and included as attorneys' fees and other costs under subsection (e) of this section may not exceed $30,000." Thus, the exception to the clause providing for the award of attorneys' fees and costs is that the compensation awarded in pre-Act cases for lost income and pain and suffering "and included as attorneys' fees and other costs under subsection (e) ... may not exceed $30,000." That is to say, that portion of the compensation which is attributable to attorneys' fees and costs relating to proving the lost income and pain and suffering portion of the claim may not exceed $30,000. The key words are "and included as." They limit the scope of the exception to items which are properly included as reasonable attorneys' fees and other costs under subsection (e). The term "total amount" means that the $30,000 cap applies to the total amount awarded as attorneys' fees and costs in reference to paragraphs (3) and (4), and not to each separately. What Congress did here was expand the scope of compensation available in pre-Act cases to include lost income and pain and suffering, but limit the amount of costs and fees which could be awarded in connection with proving the same.[20]

Congress could have broadened the scope of the cap had it chosen to do so. For example, it could have substituted "including" or "together with" for "and included as," or it could have omitted the word "included" entirely, but it did not do so.

It is a basic rule of statutory construction that, where possible, effect should be given to every word and clause of a statute. *See* Sutherland Statutory Construction § 46.05 (1984). Yet, a broad construction renders the words "may include attorneys' fees and other costs included in a judgment under subsection (e) of this section" redundant and of no effect. Subsection (e) deals with the award of attorneys' fees and costs in all cases, both pre- and post-Act. Subsection (a) makes no reference to the award of attorneys' fees and costs. Originally, subsection (b) made no such reference, and if the $30,000 cap is given broad application, there is no reason for the reference that exists in the amended subsection (b).

Those who have adopted the broad construction have found that § 15(b) means this: Compensation awarded under the Program to a petitioner for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of the Act may not include the compensation described in subparagraph (1)(B) of subsection (a) of § 15, but may include all other elements of compensation described in subsection (a), except that the total of the amounts that may be paid as compensation under paragraph (3) and (4) of subsection (a) and the amount included as attorneys' fees and other costs under subsection (e) of § 15 may not exceed $30,000.

It is the conclusion of the undersigned that if that's what Congress intended, it could (and probably would) have said so in so many words in language similar to that set out above; or, in language closer to that actually used, it might have said: Compensation awarded under the Program to a petitioner under section 300aa–11 of

---

19. The exception does not relate back to the first clause because the first clause only says what "may not" be paid and the language of the exception does not affect that exclusion; it only limits what may be paid.

20. In his article analyzing the Act, Allen Lenchek reaches a slightly different conclusion, but one which is consistent with limiting the scope of the $30,000 cap: "There is legislative history suggesting that this provision is intended to place a cap of $30,000 on the combination of attorneys' fees and payment for lost earnings and pain and suffering. (Footnote omitted.) However, nothing in the act requires that payment for lost earnings be included in the payment for attorneys' fees and costs under subsection (e). The quoted clause would make it optional to include the payment for lost earnings in attorneys' fees. The clause appears to be fertile ground for litigation." Lenchek, A Shot in the Arm, *The Washington Lawyer*, Vol. 3, No. 4 at 26.

this title for a vaccine-related injury or death associated with the administration of a vaccine before the effective date of this subpart may not include the compensation described in paragraph (1)(B) of subsection (a) of the section, and the total of the amounts that may be paid as compensation under paragraphs (3) and (4) of subsection (a) of this section and the amount included as attorneys' fees and other costs under subsection (e) of this section may not exceed $30,000.

In either case, there would have been no need or reason for Congress to have made the reference to attorneys' fees and costs that it made in the second clause of the amended § 15(b). That clause's *raison d'etre* must lie in its connection to the "except" clause which follows it. The construction recommended herein acknowledges that connection and gives meaning and effect—which is otherwise lacking—to every word of the amended section.

As noted in the Lenchek article, *supra* note 20, there is legislative history suggesting that a comprehensive cap is what Congress intended. But there is a paucity of legislative history. There is no record of the 1987 amendments to the Act being introduced on the floor of either house of Congress or of any comments relating to the need for them or their purpose. There is no record of any floor debate on them. In fact, the amendments were part of the infamous Omnibus Budget Reconciliation Act of 1987, Pub.L. 100–203, 101 Stat. 1330, a massive piece of legislation which funded

practically the entire operating budget of the United States government for FY 1988.[21]

The only legislative history which has been found is a report of the Committee on the Budget of the House of Representatives, H.R.Rep. 391, 100th Cong., 1st Sess. 690, *reprinted in* 1987 U.S.Code Cong. & Adm.News 2313–364. That report does state that the cap will apply to the aggregate of lost income, pain and suffering, and attorneys' fees and costs, *id.* at 697, but the report also contains a recent letter from the acting director of the Congressional Budget Office which reads in part:

[L]itigation expenses run about $100,-000 per case under the tort system. CBO expects both attorneys' fees and litigation expenses to be lower under the new system, since proceedings should be less adversarial and manufacturer negligence and vaccine defectiveness need not be demonstrated. However, there remains a substantial burden of proof for certain vaccine-related injuries that do not meet specific conditions listed in the law. CBO assumes attorney fees and other legal costs to be about $50,000 per case.

*Id.* at 695, 1987 U.S.Code Cong. & Adm. News 2313–369.[22]

Justice Scalia's comments in his concurring opinion in *Blanchard v. Bergeron*, —— U.S. ——, 109 S.Ct. 939, 947, 103 L.Ed.2d 67 (1989) concerning the value of committee reports in construing legislation seem

---

**21.** *See* President Reagan's State of the Union message of January 25, 1988, in which he referred to the budget act as follows:

And then, along came these behemoths. This is the conference report—1,053 pages report weighing 14 pounds. Then this—a reconciliation bill 6 months late that was 1,186 pages long, weighing 15 pounds. And the long-term continuing resolution—this one was 2 months late, and it's 1,057 pages long, weighing 14 pounds. That was a total of 43 pounds of paper and ink. You had 3 hours—yes, 3 hours—to consider each, and it took 300 people at my Office of Management and Budget just to read the bill so the Government wouldn't shut down. Congress shouldn't send another one of these. No. And if you do, I will not sign it.

Weekly Compilation of Presidential Documents, Vol. 24, No. 4 at 87.

In referring to an unrelated section of the budget act, the Washington Post reported editorially: "Not one member in 20 was aware of them as the two houses voted last month. That is how the game is played in the back pages of omnibills like these. It is another example of why such bills—in which enormous issues go not merely undebated, but unrecognized—are such bad ideas." Washington Post, Jan. 6, 1988, at A22. Members of Congress were also critical of the process and the result. *See, e.g., Congressional Quarterly,* Vol 45, No. 51 at 3117–3119.

**22.** Here again, the analysis apparently does not take into consideration fees and costs attributable to prior civil actions, which may be compensable under § 15(e).

particularly appropriate here.[23] The report of a single committee of a single house cannot be considered determinative in construing the meaning of the section. Moreover, a narrow construction of the section contradicts the express purpose of the Act "to establish a Federal 'no-fault' compensation program under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and *generosity.*" (Emphasis added.) H.R.Rep. 908, *supra* at 3, 1986 U.S.Code Cong. & Adm.News 6344. A $30,000 cap on lost income and pain and suffering is not only not generous; when put in the same pot with attorneys' fees and costs which might reasonably amount to $50,000—without considering any prior civil action—it becomes illogical. To the extent the $30,000 is allocated to attorneys' fees and costs, an injured petitioner is denied recovery for lost income and pain and suffering. To the extent the court allocates the $30,000 to a petitioner, the attorney is further denied fair compensation.

To summarize, in considering the overall purpose of the Act, the actual wording of amended § 15(b), the context in which it became law, the awards which are otherwise available under the Act for lost income and pain and suffering, the unfairness of statutorily limiting an attorney to a fee which does not reasonably reflect the value of the time spent on the case, *see* § 15(e)(3) and note 11, *supra,* and the financial conflict of interest between attorney and client which would result from construing the cap broadly, the undersigned is persuaded that the $30,000 limit of § 15(b) applies only to the total amount of attorneys' fees and costs attributable to proving the lost income and pain and suffering elements of compensation in pre-Act injury cases, an amount far in excess of the total fees and costs requested here.[24]

## PROPOSED CONCLUSIONS OF LAW

1. Petitioner is entitled to an award of $598,379 for loss of income.[25]

2. Petitioner is entitled to an award of $150,000 for pain and suffering and emotional distress.

3. Petitioner is entitled to recover reasonable attorneys' fees and costs in the amount of $2,919.02.

[Attachment A appears on page 408.]

23. *See also Hart v. United States,* 218 Ct.Cl. 212, 227, 585 F.2d 1025, 1033 (1978).

24. Legislation which would amend the language of § 15(b) of the Act clearly to impose a broad $30,000 cap on pre-Act case awards, including in all pending cases, has been passed by the Congress but not signed by the President. *See* H.R. 3299, 101 Cong., 1st Sess., 135 Cong.Rec. H9388–477 (1989).

25. If the alternative construction of § 15(b) were adopted, then the total award in this case would be limited to $30,000, leaving petitioner with less than 11% of what she would have been entitled to under the Act had Mark died from the administration of the vaccine.

## ATTACHMENT A
Present Value of Lost Earnings @
2.25% Discount Rate

| Year | Value |
|------|-------|
| 1969 | 8,381[a] |
| 1970 | 16,763 |
| 1971 | 16,763 |
| 1972 | 16,763 |
| 1973 | 16,763 |
| 1974 | 16,763 |
| 1975 | 16,763 |
| 1976 | 16,763 |
| 1977 | 16,763 |
| 1978 | 16,763 |
| 1979 | 16,763 |
| 1980 | 16,763 |
| 1981 | 16,763 |
| 1982 | 16,763 |
| 1983 | 16,763 |
| 1984 | 16,763 |
| 1985 | 16,763 |
| 1986 | 16,763 |
| 1987 | 16,763 |
| 1988 | 16,763 |
| 1989 | 16,763 |
| 1990 | 16,386 |
| 1991 | 16,017 |
| 1992 | 15,657 |
| 1993 | 15,304 |
| 1994 | 14,960 |
| 1995 | 14,623 |
| 1996 | 14,294 |
| 1997 | 13,973 |
| 1998 | 13,658 |
| 1999 | 13,351 |
| 2000 | 13,051 |
| 2001 | 12,757 |
| 2002 | 12,470 |
| 2003 | 12,189 |
| 2004 | 11,915 |
| 2005 | 11,647 |
| 2006 | 11,385 |
| 2007 | 11,129 |
| 2008 | 9,972[b] |
| TOTAL: | $598,379 |